No. 19-16839

# United States Court of Appeals for the Ninth Circuit

———————

SPIRIT OF ALOHA TEMPLE, et al.,

*Plaintiffs-Appellants*,

v.

COUNTY OF MAUI, et al.,

*Defendants-Appellees.*

———————

Appeal from the Judgment of the
U.S. District Court for the District of Hawaii
No. 1:14-cv-00535-SOM-WRP, Hon. Susan Oki Mollway

———————

## BRIEF OF *AMICI CURIAE* JEWISH COALITION FOR RELIGIOUS LIBERTY AND CHABAD LUBAVITCH OF NORTHWEST CONNECTICUT IN SUPPORT OF APPELLANTS

———————

Christopher Pagliarella
YALE LAW SCHOOL
FREE EXERCISE CLINIC
1200 New Hampshire
Avenue, N.W., Suite 700
Washington, D.C. 20036
Tel: 202-830-1434
christopher.pagliarella@yale.edu

Gordon D. Todd
Robin Wright Cleary
Daniel J. Hay
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Tel: (202) 736-8000
gtodd@sidley.com
rcleary@sidley.com
dhay@sidley.com

*Counsel for Amici Curiae\**

———————

*\*Counsel acknowledge Yale Law School Free Exercise Clinic students Emmett Gilles and Isabelle Hanna for their contributions to this brief.*

## RULE 26.1 DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1, the Jewish Coalition for Religious Liberty and Chabad Lubavitch of Northwest Connecticut hereby certify that they have no parent corporation and that no publicly held corporation owns 10% or more of their stock.


March 6, 2020 /s/ Gordon D. Todd

Gordon D. Todd

*Counsel to Amici Curiae*

i

# **TABLE OF CONTENTS**

DISCLOSURE STATEMENT ....................................................i

TABLE OF AUTHORITIES ................................................iii

INTEREST OF *AMICI CURIAE* ........................................ 1

INTRODUCTION ........................................................... 3

ARGUMENT .................................................................. 6

    I.    Shielding Discretionary Local Decisions from Meaningful Review Poses a Special Threat to the Religious Exercise of Religious Minorities Such As *Amici.* ............................................................ 6

        A.    RLUIPA Requires Independent Judicial Scrutiny of Land Use Decisions to Ensure They Are Not Motivated by Prejudice. ................................... 8

        B.    RLUIPA Protects Orthodox Jewish Communities from Local Animus Often Left Unchecked by State Courts. ................................................. 11

        C.    Giving Preclusive Effect to Local Land Use Commissions Exercising Standardless Discretion Enables Discrimination Against Unpopular Religious Groups. ....................................... 19

CONCLUSION ........................................................... 25

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Am. Gen. Ins. Co. v. FTC.*,
  589 F.2d 462 (9th Cir. 1979) ............................................................. 20

*Bikur Cholim, Inc. v. Vill. of Suffern*,
  No. 7:05-cv-10759, 2011 WL 2893071 (S.D.N.Y. June 29,
  2011) ..................................................................................................... 14

*Cent. UTA of Monsey v. Vill. of Airmont*,
  No. 18 CV 11103, 2020 WL 377706 (S.D.N.Y. Jan. 23,
  2020) ..................................................................................................... 14

*Chabad Jewish Ctr. of Toms River, Inc. v. Twp. of Toms
  River*,
  No. 3:16-01599, 2018 WL 1942360 (D.N.J. Feb. 5, 2018) .................. 14

*Chabad Lubavitch of Litchfield Cty., Inc. v. Litchfield
  Historic Dist. Comm'n*,
  768 F.3d 183 (2d Cir. 2014) ........................................................... 2, 7

*Congregation Etz Chaim v. City of Los Angeles*,
  No. CV 10-1587, 2011 WL 12462883 (C.D. Cal. Jan. 6,
  2011) ............................................................................................... 10, 20

*Congregation Kollel, Inc. v. Twp. of Howell*,
  No. 16-2457, 2017 WL 637689 (D.N.J. Feb. 16, 2017) ...................... 14

*Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of
  Pomona*,
  280 F. Supp. 3d 426 (S.D.N.Y. 2017), *aff'd in relevant
  part*, 945 F.3d 83 (2d Cir. 2019) ......................................................... 18

*Desert Outdoor Advert., Inc. v. City of Moreno Valley*,
  103 F.3d 814 (9th Cir. 1996) ............................................................... 22

*Dias v. Elique,*
436 F.3d 1125 (9th Cir. 2006)..............................................................20

*England v. La. State Bd. of Med. Exam'rs,*
375 U.S. 411 (1964)............................................................................22

*Epona, LLC v. Cty. of Ventura,*
876 F.3d 1214 (9th Cir. 2017)......................................................23, 24

*G.K. Ltd. Travel v. City of Lake Oswego,*
436 F.3d 1064 (9th Cir. 2006)..............................................................22

*Guru Nanak Sikh Soc'y of Yuba City v. Cty. of Sutter,*
326 F. Supp. 2d 1128 (E.D. Cal. 2003) ...............................................20

*Guru Nanak Sikh Soc'y of Yuba City v. Cty. of Sutter,*
456 F.3d 978 (9th Cir. 2006)..................................................................7

*Int'l Church of Foursquare Gospel v. City of San Leandro,*
673 F.3d 1059 (9th Cir. 2011)................................................................6

*Knick v. Twp. of Scott,*
139 S. Ct. 2162 (2019)...................................................................21, 22

*Littlejohn v. United States,*
321 F.3d 915 (9th Cir. 2003)................................................................21

*Real v. City of Long Beach,*
852 F.3d 929 (9th Cir. 2017)................................................................23

*Smith v. Cmty. Bd. No. 14,*
491 N.Y.S.2d 584 (Sup. Ct. 1985).......................................................16

*Spirit of Aloha Temple v. Cty. of Maui,*
409 F. Supp. 3d. 889 (D. Haw. 2019)..................................................21

*Sts. Constantine & Helen Greek Orthodox Church, Inc. v.
City of New Berlin,*
396 F.3d 895 (7th Cir. 2005)..................................................................6

*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly,*
309 F.3d 144 (3d Cir. 2002) ................................................................17

iv

*Westchester Day Sch. v. Vill. of Mamaroneck*,
   504 F.3d 338 (2d Cir. 2007) ................................................................ 18

*Whole Woman's Health v. Smith*,
   896 F.3d 362 (5th Cir. 2018), *cert. denied sub nom. Whole
   Woman's Health v. Tex. Catholic Conference of Bishops*,
   139 S. Ct. 1170 (2019) (mem.) ............................................................ 1

## Statutes and Regulations

Religious Land Use and Institutionalized Persons Act of
   2000, Pub. L. No. 106-274, 114 Stat. 803 (codified at 42
   U.S.C. §§ 2000cc to 2000cc-5) ............................................................ 3

42 U.S.C. § 2000cc ...................................................................................... 10

42 U.S.C. § 2000cc-2 ..................................................................... 10, 20, 21

42 U.S.C. § 2000cc-3 .................................................................................. 10

## Legislative Materials

*Religious Liberty: Hearing Before the S. Comm. on the
   Judiciary*, 106th Cong. (1999) ............................................................ 9

146 Cong. Rec. 16,698 (2000) ........................................................... 8, 9, 10

## Scholarly Authorities

Barry Black, *How Courts Paved the Way for the Eruv*,
   N.Y.L.J. Online (Feb. 28, 2019) .......................................................... 16

Lucien J. Dhooge, *A Case Law Survey of the Impact of
   RLUIPA on Land Use Regulation*, 102 Marq. L. Rev. 985
   (2019) ................................................................................................... 11

Von G. Keetch & Matthew K. Richards, *The Need for
   Legislation to Enshrine Free Exercise in the Land Use
   Context*, 32 U.C. Davis L. Rev. 725 (1999) ......................................... 15

Douglas Laycock, *State RFRAs and Land Use Regulation*, 32
   U.C. Davis L. Rev. 755 (1999) ............................................................. 9

Christopher Serkin & Nelson Tebbe, *Condemning Religion: RLUIPA and the Politics of Eminent Domain*, 85 Notre Dame L. Rev. 1 (2009) ......................................................................... 15

Roman P. Storzer & Anthony R. Picarello, Jr., *The Religious Land Use and Institutionalized Persons Act of 2000: A Constitutional Response to Unconstitutional Zoning Practices*, 9 Geo. Mason L. Rev. 929 (2001) ....................................... 15

**Other Authorities**

*ADL H.E.A.T. Map*, Anti-Defamation League, https://www. adl.org/education-and-resources/resource-knowledge-base/ adl-heat-map (last visited Mar. 5, 2020) ............................................ 13

Justin Auciello, *Police Investigating Anti-Semitic Graffiti in Toms River*, WHYY PBS (Mar. 2, 2016), https://whyy.org/ articles/police-investigating-anti-semitic-graffiti-in-toms-river .................................................................................................... 12

Sarah Brown, *Growing Anti-Semitism in California and Globally*, Pac. Council on Int'l Pol'y (Oct. 11, 2019), https://www.pacificcouncil.org/newsroom/growing-anti-semitism-california-and-globally .......................................................... 13

*FAQ: Does the Construction of an Eruv in My Area Mean that Orthodox Jews Are Claiming Ownership of My House?*, Eruv Litig. Info., http://www.eruvlitigation.com/ ufaqs/construction-eruv-area-mean-orthodox-jews-claiming-ownership-house/ (last visited Mar. 5, 2020) ...................... 17

Letter from George Washington to the Hebrew Congregation in Newport, Rhode Island (Aug. 18, 1790), *available at* https://founders.archives.gov/documents/Washington/05-06-02-0135 ......................................................................................... 24

Diana Neeves & Evan Seeman, *Mahwah, NJ Agrees to Settle Eruv Dispute*, RLUIPA Def. (Feb. 7, 2018), https://www. rluipa-defense.com/2018/02/mahwah-nj-agrees-to-settle-eruv-dispute/ ................................................................................... 16

Ben Sales, *Insisting It Is Not Anti-Semitic, NJ Group Sees Haredi Orthodox as a Threat to 'Quality of Life,'* Jewish Telegraphic Agency (Jan. 23, 2019), https://www.jta.org/2019/01/23/united-states/insisting-it-is-not-anti-semitic-nj-group-sees-haredi-orthodox-as-a-threat-to-their-quality-of-life ...................................................................................... 13

Evan Seeman, *Clifton, NJ Pays $2.5 Million to Settle RLUIPA Dispute*, RLUIPA Def. (Jan. 10, 2019), https://www.rluipa-defense.com/2019/01/clifton-nj-pays-2-5-million-to-settle-rluipa-dispute ........................................................... 17

## INTEREST OF *AMICI CURIAE*[1]

The **Jewish Coalition for Religious Liberty** ("Jewish Coalition") is an association of American Jews dedicated to protecting the ability of all Americans to practice their faith freely, to protect Jewish beliefs particularly, and to foster cooperation between Jews and other faith communities. The Jewish Coalition's leaders have filed *amicus* briefs in the U.S. Supreme Court and lower federal courts, published op-eds in prominent news outlets, and established an extensive volunteer network to spur public statements and action on religious liberty issues by Jewish communal leadership. *See, e.g.*, *Whole Woman's Health v. Smith*, 896 F.3d 362, 372 (5th Cir. 2018) (citing to Jewish Coalition brief for guidance on First Amendment question), *cert. denied sub nom. Whole Woman's Health v. Tex. Catholic Conference of Bishops*, 139 S. Ct. 1170 (2019) (mem.). The Jewish Coalition has a strong interest in religious rights of particular importance to minority faiths, such as those secured by the

---

[1] Appellants and Appellee State of Hawaii have consented to the filing of this brief; the Maui Appellees have not responded to emails requesting consent to file this brief. No party's counsel authored the brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person other than *amici curiae* or their counsel contributed money intended to fund preparing or submitting the brief.

land use provisions of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), and frequently briefs such issues. *See, e.g.*, Brief of the Jewish Coalition for Religious Liberty as *Amicus Curiae* in Support of Petitioner, *Tree of Life Christian Schs. v. City of Upper Arlington*, 139 S. Ct. 2011 (2019) (mem.) (No. 18-944), 2019 WL 949895 (urging certiorari grant on circuit split regarding RLUIPA, explaining impact on observant Jewish communities).

**Chabad Lubavitch of Northwest Connecticut** ("Chabad") is a community-based nonprofit organization rooted in traditional Jewish values. Part of the largest Jewish outreach organization in the world, Chabad came to Northwest Connecticut in 1996, and has grown to be a leading social service, educational, and Jewish arts organization in the region. Chabad was also the lead plaintiff in *Chabad Lubavitch of Litchfield County, Inc. v. Litchfield Historic District Commission*, 768 F.3d 183 (2d Cir. 2014), a precedent-setting decision described further within the brief that expanded access to RLUIPA remedies in the Second Circuit for substantial-burden land use claims like the one in this case. Grounded in both its experience and faith commitments, Chabad is concerned with

ensuring effective access to RLUIPA remedies for minority faith communities, and particularly the hundreds of Chabad branches throughout the Ninth Circuit.

## INTRODUCTION

The importance of land to religious practice is as ancient as religious practice itself. In Judaism, as in many other traditions, the ability to establish places of worship, to gather for prayer and reflection, and to congregate in sorrow or celebration—including for marriages—goes to the very heart of the free exercise of religion.

Recognizing that local land regulation can—inadvertently or perniciously—hamper this core religious exercise, Congress enacted the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") to safeguard religious land use. *See* Pub. L. No. 106-274, 114 Stat. 803 (codified at 42 U.S.C. §§ 2000cc to 2000cc-5). Over the past 20 years, RLUIPA has been a vital protection for minority faith organizations such as *amici*, whose missions include establishing centers for observant Jewish life in new communities and fostering relationships between Jewish leadership and local institutions.

The rulings below made two errors that, if ratified by this Court, would curtail the meaningful hearing of RLUIPA claims in federal court, removing a vital tool that Jews have used to protect themselves against anti-Semitism. *First*, the district court gave excessive preclusive effect to a local land use commission's denial of Appellants' application for a zoning variance. *See* Opening Br. 15-17. Without any meaningful review, the court adopted the commission's boilerplate conclusion that its own decision was the least restrictive means of advancing the county's compelling interest in road safety. If affirmed, this precedent would allow local officials to insulate their own decisions against review, preventing federal courts from reaching the merits of federal civil rights claims and effectively kicking religious adherents out of court without a full and fair opportunity to argue their case. This is especially dangerous to members of minority faiths, whose zoning applications are frequently denied because their religious obligations are not immediately obvious or well-understood.

*Second*, the district court upheld a set of ambiguous and indeterminate planning commission guidelines. *See id.* at 34. Vesting local bureau-

crats with broad and standardless discretion would enable them to obscure the bases for their planning decisions, allowing prejudice to hide behind legitimate public concerns. In recent years, Jewish communities have used RLUIPA lawsuits to expose and confront such covert anti-Semitism. This Court should ensure that RLUIPA can continue to serve that important function.

Affirming the decisions below would weaken civil rights protections guaranteed to all people of faith—protections that are particularly important today. As readily identifiable religious minorities, *amici* are well aware of the disturbingly frequent and concerted discrimination against such groups, including anti-Semitic opposition to the establishment, growth and flourishing of Jewish communities. RLUIPA and the First Amendment form a valuable bulwark against overt and subtle anti-Semitism. The decision below dilutes these statutory and constitutional protections and threatens to make some American communities less hospitable homes for American Jews.

**ARGUMENT**

**I.  SHIELDING DISCRETIONARY LOCAL DECISIONS FROM MEANINGFUL REVIEW POSES A SPECIAL THREAT TO THE RELIGIOUS EXERCISE OF RELIGIOUS MINORITIES SUCH AS *AMICI*.**

For a religious institution, "having 'a place of worship . . . is at the very core of the free exercise of religion," since "[c]hurches and synagogues cannot function without a physical space adequate to their needs and consistent with their theological requirements." *Int'l Church of Foursquare Gospel v. City of San Leandro*, 673 F.3d 1059, 1069 (9th Cir. 2011) (omission and alteration in original) (quoting *Vietnamese Buddhism Study Temple in Am. v. City of Garden Grove*, 460 F. Supp. 2d 1165, 1171 (C.D. Cal. 2006)). Yet in the religious land use context, courts have observed the "vulnerability of religious institutions—especially those that are not affiliated with the mainstream"—"to subtle forms of discrimination when, as in the case of the grant or denial of zoning variances, a state delegates essentially standardless discretion to nonprofessionals operating without procedural safeguards." *Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 900 (7th Cir. 2005). As the Second Circuit made clear in the precedent-setting case led by *amicus curiae* Chabad, because RLUIPA is concerned with "subtle

6

forms of discrimination," its protections against substantial burdens on religious exercise extend to all "individualized" assessments—even those based on "generally applicable land use regulations." *Chabad Lubavitch of Litchfield Cty.*, 768 F.3d at 193-95.

Congress enacted RLUIPA to ensure that independent and rigorous review would protect vulnerable religious groups such as *amici* from discriminatory zoning decisions. To carry out this purpose, RLUIPA establishes more exacting procedural safeguards than state-court review. Similarly, the First Amendment's bar on prior restraints shields minority faiths from official discretion to deny use permits without providing discrete reasons, and acts as a backstop against evasion of protections like RLUIPA. *Amici* therefore press the Court not to adopt reasoning that could gut federal review of RLUIPA claims through the dual mistake of undue deference and encouraging evasion.

*Amici* emphasize that this decision will have significant impact on religious minorities. Recent experience—and particularly the experience of the Orthodox Jewish community represented by *amici*—suggests that the concerns animating RLUIPA persist. *See Guru Nanak Sikh Soc'y of Yuba City v. Cty. of Sutter*, 456 F.3d 978, 994 (9th Cir. 2006) (noting that

in nine hearings preceding RLUIPA's enactment, Congress heard how "governmental entities nationwide purposefully exclude unwanted religious groups by denying them use permits through discretionary and subjective standards and processes"). Ensuring robust access to RLUIPA remedies remains as essential for religious land users as the day RLUIPA was passed, and *amici* urge this Court to preserve this access by reversing the holdings below.

### A. RLUIPA Requires Independent Judicial Scrutiny of Land Use Decisions to Ensure They Are Not Motivated by Prejudice.

Giving local authorities' land use decisions preclusive effect in federal proceedings would thwart RLUIPA's core protective purpose. In enacting RLUIPA, Congress took special note of prevalent "discrimination against small and unfamiliar denominations," finding "massive evidence" that land controls "frequently violate[]" religious rights, especially those of "new, small, or unfamiliar" houses of worship. 146 Cong. Rec. 16,698, 16,698-99 (2000) (joint statement of Sens. Hatch and Kennedy) (noting how frequently "discrimination lurks behind such vague and universally applicable reasons as traffic, aesthetics, or not consistent with the city's land use plan").

8

As members of a readily identifiable minority group, Orthodox Jews, including members of *amici*, face particularly frequent and concerted efforts to label them as outsiders, frustrate the building of their schools and religious facilities, and prohibit their prayer gatherings. Adverse zoning decisions are also particularly problematic for *amici*, whose observance of the Jewish Sabbath and other festivals requires locating synagogues and ritual baths within walking distance of residential neighborhoods. Testifying in support of RLUIPA, the Director of the Union of Orthodox Jewish Congregations of America ("Orthodox Union") explained that the "flourishing of traditional Jewish communities has given rise to another, more unfortunate trend, the use of land use regulations and zoning boards to discriminate against religious communities." *Religious Liberty: Hearing Before the S. Comm. on the Judiciary*, 106th Cong. 21, 24 (1999) (prepared statement of Nathan J. Diament, Dir. of Inst. for Pub. Affairs, Orthodox Union). Because land use decisions involve "individualized assessments," they "readily lend themselves to discrimination" against minority faiths and "make it difficult to prove discrimination in any individual case." 146 Cong. Rec. at 16,699 (joint statement of Senators Hatch and Kennedy); *see also* Douglas Laycock, *State RFRAs*

9

*and Land Use Regulation*, 32 U.C. Davis L. Rev. 755, 776 (1999) (observing that individualized land use regulations provide "ample opportunity for expression" of regulators' hostility to religion).

In unanimously enacting RLUIPA, Congress sought to provide a "solution to religious discrimination" by local authorities. *Congregation Etz Chaim v. City of Los Angeles*, No. CV 10-1587, 2011 WL 12462883, at *7 (C.D. Cal. Jan. 6, 2011). RLUIPA thus requires more rigorous scrutiny than the review for "clear error" or "abuse of discretion" afforded by the Hawaii circuit court. *See* 42 U.S.C. §§ 2000cc, 2000cc-2(b). *Compare* ER 467-470 *with* 146 Cong. Rec. at 16,702 (statement of Sen. Reid) (observing that RLUIPA would impose "a high standard to meet, certainly much higher than current law, where zoning regulations are rarely overturned in court on religious exercise grounds"). Congress instructed federal courts *not* to rubber-stamp zoning boards' rulings in RLUIPA's "full faith and credit" provision and required courts to construe RLUIPA's terms "in favor of a broad protection of religious exercise." *See* 42 U.S.C. §§ 2000cc-2(c), 2000cc-3(g). Orthodox Jews combatting anti-Semitic exclusion and obstruction efforts have relied on RLUIPA for searching review of local land use decisions.

10

## B. RLUIPA Protects Orthodox Jewish Communities from Local Animus Often Left Unchecked by State Courts.

Robust enforcement of RLUIPA's protections is crucial for *amici*, whose free religious exercise at home, in synagogue, and at Chabad House community centers can face prejudice in local decision-making. Land controls and community planning have long served as vehicles for discrimination by state and private actors against religious Jews, and this discrimination is often unchecked by state courts. *See* Lucien J. Dhooge, *A Case Law Survey of the Impact of RLUIPA on Land Use Regulation*, 102 Marq. L. Rev. 985, 1022-25 (2019) (finding only 5 successful outcomes and 1 settlement in the 37 reported RLUIPA claims brought in state court, suggesting that "the bias alleged to exist within local governments extends to state courts which have turned a blind eye to free exercise rights in the context of land usage"). Federal courts' involvement has been essential to unmask and defang these exclusionary policies. *Id.* at 1028-29 (finding 32 successful outcomes and 40 settlements out of 139 RLUIPA claims in federal court, 18 claims brought by religious Jews).

Unabashed anti-Semitic vitriol too often seeps into local land controls. In 2016, a New Jersey town prohibited a Chabad rabbi from hosting small weekly prayer services of ten to fifteen people at his residence.

11

Complaint ¶ 2, *Chabad Jewish Ctr. of Toms River, Inc. v. Twp. of Toms River*, No. 3:16-cv-01599 (D.N.J. Mar. 22, 2016). In the lead-up to the denial, the town's mayor likened ultra-Orthodox Jews moving in to an "invasion." *Id.* ¶¶ 3, 128. When asked if he regretted this remark, he stated "I have nothing to apologize for. . . . I don't feel like I did anything wrong." *Id.* ¶ 3 (omission in original). Town residents also evinced anti-Semitic hostility, etching "Burn the Jews" on local playground equipment, referring to Orthodox Jews in offensive and derogatory terms, placing lawn signs reading "DON'T SELL!" and issuing veiled threats against Jewish residents if prayer meetings were permitted. *Id.* ¶¶ 127-50; *see, e.g.*, Justin Auciello, *Police Investigating Anti-Semitic Graffiti in Toms River*, WHYY PBS (Mar. 2, 2016), https://whyy.org/articles/police-investigating-anti-semitic-graffiti-in-toms-river.

In early 2019, another group in the same New Jersey county counseled their neighbors against selling their homes to Orthodox Jews. The group blamed the Jewish community for "pressure sales," "build[ing] homes at the expense of the environment," and "[seizing] control" of the local governing bodies, but it insisted that its concerns were only about "zoning, housing density and local support for public schools" rather than

12

motivated by anti-Semitism. *See* Ben Sales, *Insisting It Is Not Anti-Semitic, NJ Group Sees Haredi Orthodox as a Threat to 'Quality of Life,'* Jewish Telegraphic Agency (Jan. 23, 2019), https://www.jta.org/2019/01/23/united-states/insisting-it-is-not-anti-semitic-nj-group-sees-haredi-orthodox-as-a-threat-to-their-quality-of-life. And the rising tide of anti-Semitism is not limited to Greater New York; multiple third-party organizations have observed a spike since 2017 in anti-Semitic hate crimes in the United States nationwide and in California specifically. Sarah Brown, *Growing Anti-Semitism in California and Globally*, Pac. Council on Int'l Pol'y (Oct. 11, 2019), https://www.pacificcouncil.org/newsroom/growing-anti-semitism-california-and-globally; *see ADL H.E.A.T. Map*, Anti-Defamation League, https://www.adl.org/education-and-resources/resource-knowledge-base/adl-heat-map (last visited Mar. 5, 2020) (estimating 3,912 reported incidents of anti-Semitism in 2018 and 2019, with more than 660 in California alone).

RLUIPA has provided crucial protection for religiously oriented land users. For example, after the incidents discussed above, Chabad Jewish Center of Toms River brought an RLUIPA suit in federal court, alleging a substantial burden without a narrowly tailored or compelling

13

government interest, discrimination on the basis of religion, and an attempt to totally exclude Chabad from the municipality. The judge entered judgment on the pleadings, determining that the local board's denial of the application to use the property as a Chabad house violated RLUIPA. *See Chabad Jewish Ctr. of Toms River, Inc. v. Twp. of Toms River*, No. 3:16-01599, 2018 WL 1942360 (D.N.J. Feb. 5, 2018).

Sadly, discriminatory denials like this one remain a feature of zoning regulations. *See, e.g.*, *Cent. UTA of Monsey v. Vill. of Airmont*, No. 18 CV 11103, 2020 WL 377706 (S.D.N.Y. Jan. 23, 2020) (rejecting motion to dismiss Hasidic school's RLUIPA claims against municipality for preventing its expansion and refusing to provide transportation and special-needs services); *Congregation Kollel, Inc. v. Twp. of Howell*, No. 16-2457, 2017 WL 637689 (D.N.J. Feb. 16, 2017) (finding ripe Orthodox seminary's RLUIPA substantial burden and religious discrimination challenge to zoning denial); *Bikur Cholim, Inc. v. Vill. of Suffern*, No. 7:05-cv-10759, 2011 WL 2893071 (S.D.N.Y. June 29, 2011) (awarding attorneys' fees in successful RLUIPA challenge to municipality's denial of a zoning permit for use of property as a guesthouse within walking distance of hospitalized patients).

Even where hostility is not as overt as in some of the examples above, suspicion and misunderstandings about Orthodox Jews often inform adverse land use decisions. Yet these improper motives can be invisible on the record, insulating a local decision against procedural review for arbitrariness. *See* Von G. Keetch & Matthew K. Richards, *The Need for Legislation to Enshrine Free Exercise in the Land Use Context*, 32 U.C. Davis L. Rev. 725, 726, 729 (1999) (describing how "ignorance and even hostility toward religion sometimes operate behind the facade of ostensibly neutral land use regulations"); Christopher Serkin & Nelson Tebbe, *Condemning Religion: RLUIPA and the Politics of Eminent Domain*, 85 Notre Dame L. Rev. 1, 5, 21 (2009) (explaining that "discrimination is so hard to unearth" in land use decisions because they are "often handed down with insufficient reasoning, and so commonly governed by standards that leave ample room for subjectivity, that courts have a difficult time policing them for antireligious activity"). Discrimination cloaked in neutral terms is especially problematic for visibly different minority faiths like *amici*. *See* Roman P. Storzer & Anthony R. Picarello, Jr., *The Religious Land Use and Institutionalized Persons Act of 2000: A*

*Constitutional Response to Unconstitutional Zoning Practices*, 9 Geo. Mason L. Rev. 929, 941 (2001) (noting that religions with practices unfamiliar or distasteful to the general public face a higher risk of discrimination in land use decisions).

Facially neutral land use regulations can impede practices essential to Orthodox Jewish life. For example, local governments have long sought to prevent Jewish communities from constructing *eruvs*, symbolic enclosures that allow Orthodox Jews to push strollers, transport food, and carry basic items like keys outside their homes on the Sabbath. *See, e.g.*, Diana Neeves & Evan Seeman, *Mahwah, NJ Agrees to Settle Eruv Dispute*, RLUIPA Def. (Feb. 7, 2018), https://www.rluipa-defense.com/2018/02/mahwah-nj-agrees-to-settle-eruv-dispute/; *Smith v. Cmty. Bd. No. 14*, 491 N.Y.S.2d 584 (Sup. Ct. 1985); *see also* Barry Black, *How Courts Paved the Way for the Eruv*, N.Y.L.J. Online (Feb. 28, 2019) (noting that eruv litigation "goes back decades" and is often "hard fought").

Local governments have also blocked the construction of *mikvahs*, ritual immersion baths that Orthodox women visit after completing their

menstrual cycle and before resuming marital intimacy. *See, e.g.*, Complaint, *United States v. Borough of Woodcliff Lake*, No. 2:18-cv-10511 (D.N.J. June 13, 2018), https://www.justice.gov/crt/case-document/file/1071666/download; Evan Seeman, *Clifton, NJ Pays $2.5 Million to Settle RLUIPA Dispute*, RLUIPA Def. (Jan. 10, 2019), https://www.rluipa-defense.com/2019/01/clifton-nj-pays-2-5-million-to-settle-rluipa-dispute.

Unfamiliarity with religious requirements such as eruvs and mikvahs leads to confusion and misunderstandings, resulting in zoning denials that overlook or disparage the Orthodox community's needs. *See, e.g.*, *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 153 (3d Cir. 2002) (describing the "vehement objections" of community members leading to denial of a proposed eruv, including one council member's "serious concern that Ultra-Orthodox Jews might stone cars that drive down the streets on the Sabbath" (internal quotation marks and alteration omitted)); *FAQ: Does the Construction of an Eruv in My Area Mean that Orthodox Jews Are Claiming Ownership of My House?*, Eruv Litig. Info., http://www.eruvlitigation.com/ufaqs/construction-eruv-area-mean-or-

thodox-jews-claiming-ownership-house/ (last visited Mar. 5, 2020). Preventing Orthodox Jews from building such foundational structures can prevent Jews from moving into a community as effectively as a restrictive covenant barring selling homes to Jews. Fortunately, RLUPIA can prevent local communities from imposing such barriers to entry.

Robust scrutiny often exposes the ostensible neutral basis for an adverse land use decision against Orthodox groups as pretextual. For example, in Mamaroneck, New York, a local zoning board denied an Orthodox day school a permit to expand. *Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 338 (2d Cir. 2007). The Second Circuit ultimately concluded that increased traffic and other concerns advanced by the board failed to justify denying the permit. *Id.* at 346. The real reason for opposition was to appease "small but influential group of neighbors who were against the school's expansion plans." *Id.*

Similarly, the Second Circuit affirmed a district court finding that Pomona, New York used its zoning laws as a pretext for discriminating against an Orthodox rabbinical college. *See Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 280 F. Supp. 3d 426, 463, 465 (S.D.N.Y. 2017) ("[N]one of [the municipality's] theorizing changes in any

18

way the overwhelming evidence of discriminatory animus, or the fact that this law served no compelling interests. . . . In light of Defendants' failure to provide any credible justification for the passage of the Wetlands Law, or even explain what purpose it serves, the Court is left to conclude that the law was enacted to thwart Tartikov's proposed rabbinical college."), *aff'd in relevant part*, 945 F.3d 83 (2d Cir. 2019). Rigorous enforcement of RLUIPA in federal courts, through application of strict scrutiny, is vital for exposing and uprooting hidden local discrimination against land users like *amici*. By contrast, Orthodox communities will suffer from unchecked local discrimination if federal courts decline to review zoning boards' self-interested findings or allow local authorities unfettered discretion in denying permit applications.

**C.   Giving Preclusive Effect to Local Land Use Commissions Exercising Standardless Discretion Enables Discrimination Against Unpopular Religious Groups.**

If allowed to stand, the decision below would deny religious minorities like *amici* protective judicial review despite RLUIPA's strong presumption against applying issue preclusion to the final determinations of local planning commissions, giving cover to the foregoing sorts of per-

nicious discrimination. Appellants never received a "full and fair" adjudication of their RLUIPA claims. 42 U.S.C. § 2000cc-2(c). Those claims arose upon the Commission's denial of Appellants' special use permit. Appellant's RLUIPA claims did not yet exist, and therefore could not be fully litigated, when the Commission issued its preclusive finding that denying the proposed use was the least restrictive means of advancing a compelling interest in road safety. *See Guru Nanak Sikh Soc'y of Yuba City v. Cty. of Sutter*, 326 F. Supp. 2d 1128, 1133 (E.D. Cal. 2003) (declining to give preclusive effect in subsequent RLUIPA claim to a local planning commission's "ultimate decision" which "gave rise to plaintiff's [RLUIPA] claims"); *Congregation Etz Chaim*, 2011 WL 12462883, at *7 (noting that officials cannot "have decided on the legality of their own decision"). The Commission also failed to apply RLUIPA's prescribed "burden[s] of persuasion," although shifting such burdens may "defeat[]" issue preclusion. *See Dias v. Elique*, 436 F.3d 1125, 1129 (9th Cir. 2006) (quoting 18 Charles Alan Wright et al., *Federal Practice and Procedure* § 4422 (2d ed. 2002)). Nevertheless, the district court made the Commission the arbiter of the lawfulness of its own actions. *Contra Am. Gen. Ins. Co. v. FTC.*, 589 F.2d 462, 463 (9th Cir. 1979) (applying "a party should

20

not be judge in his own case" to an adjudicator who served as counsel in a related administrative proceeding). Limited state-court review likewise could not transform the local proceedings into a full and fair adjudication where the state court below undertook only deferential review for "clear error" and arbitrariness. *See Spirit of Aloha Temple v. Cty. of Maui*, 409 F. Supp. 3d. 889, 900 (D. Haw. 2019). "Such differences in the burden of proof . . . prevent issue preclusion." *Littlejohn v. United States*, 321 F.3d 915, 924 (9th Cir. 2003). And here, they undercut RLUIPA's strength.

Indeed, the district court's decision to force Appellants into state-court proceedings and then defer absolutely to the state court's conclusions ensnared Appellants in a "preclusion trap" similar to the one the Supreme Court recently vitiated in the takings context. *Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2167 (2019). Like takings plaintiffs, Appellants had a RLUIPA cause of action as soon as the Commission denied their request. *See* 42 U.S.C. § 2000cc-2(a); *Knick*, 139 S. Ct. at 2172-73. The district court's order required Appellants to seek relief in state court first, before their federal civil rights claim could be heard in a federal forum. But once the state court ruled against Appellants under the deferential state administrative review standard, they were barred from presenting

their RLUIPA claims in federal court. Frustrating plaintiffs' ability to pursue federal claims in this manner is precisely the dilemma recognized and eliminated in *Knick*. And the Supreme Court has made clear that Appellants' alternative route to the federal courts—a Supreme Court writ of certiorari after all state appeals—is "an inadequate substitute for the initial district court determination." *England v. La. State Bd. of Med. Exam'rs*, 375 U.S. 411, 416 (1964). Without direct district court access, RLUIPA's "guarantee of a federal forum" to protect religious liberty is a "hollow" one. *Knick*, 139 S. Ct. at 2167.

Likewise, the lower court ruling diluted protections against prior restraints on protected First Amendment expressive worship activity. Absent definite and objective guiding standards, permit requirements present the "threat of content-based, discriminatory enforcement," *G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064, 1082 (9th Cir. 2006)— precisely the sort of harms RLUIPA sought to avoid. *Amici* therefore urge the Court to affirm its precedents requiring permit guidelines to be specific and objective enough to establish "limits on the authority of City officials to deny a permit." *Desert Outdoor Advert., Inc. v. City of Moreno*

*Valley*, 103 F.3d 814, 819 (9th Cir. 1996). And effective limits mean excluding any "condition [that] confers an impermissible degree of discretion." *Epona, LLC v. Cty. of Ventura*, 876 F.3d 1214, 1224 (9th Cir. 2017).

Here, the district court sustained the guidelines' constitutionality notwithstanding serious doubts about an open-ended condition allowing denials for any proposed use that would "adversely affect surrounding property." *See* Opening Br. 45-46. Because the Court found a separate guideline sufficiently directive, however, it reasoned that plaintiffs lacked standing to challenge the first, admittedly problematic condition. *Id.* But the presence of one adequately-defined guideline does not prevent a separate, standardless guideline from readily concealing discrimination. Moreover, the guideline that the district court relied on to save the whole scheme—excluding proposed uses that "unreasonably burden" various categories of public-agency work—is *also* an open-ended standard of the sort the Ninth Circuit has routinely invalidated. *See, e.g.*, *Real v. City of Long Beach*, 852 F.3d 929, 935 (9th Cir. 2017) (invalidating a guideline restricting uses unless they would "not be detrimental to the surrounding community including public health, safety or general welfare, environmental quality or quality of life"). Even if the public-agency burdens

guideline passed muster, relying on its specificity to cure another guideline's breadth ignores the common sense rule announced in *Epona* that "if one condition confers an impermissible degree of discretion, the specificity of a separate condition will not save the scheme." 876 F.3d at 1224.

Departing from that rule is especially harmful in the RLUIPA context, where Congress anticipated that local officials may exercise facially neutral discretion in a discriminatory manner, and sought to preserve federal review of such discretion. Requiring specific criteria for permit schemes prevents local authorities from evading RLUIPA by burying decisions in overly general terms that frustrate analysis for disparate treatment.

\*    \*    \*

America has a long history of welcoming religious minorities, including Jews. *See, e.g.*, Letter from George Washington to the Hebrew Congregation in Newport, Rhode Island (Aug. 18, 1790), *available at* https://founders.archives.gov/documents/Washington/05-06-02-0135. Yet as the foregoing discussion demonstrates, our communities have not been entirely free of the virus of anti-Semitism. RLUIPA is an important bulwark against such discrimination, and this Court should make sure that

24

RLUIPA retains its full force to continue protecting Americans Jews and religious land users of all faiths. By holding fast to a rigorous understanding of both "full and fair" adjudication under RLUIPA and the First Amendment bar on standardless permitting schemes that can frustrate judicial review, this Court can ensure that discrimination will not fester unchecked at a time when it is sadly growing.

## <u>CONCLUSION</u>

*Amici* respectfully request the Court to reverse the decision of the district court.

March 6, 2020

Respectfully submitted,

 /s/ Gordon D. Todd

| | |
|---|---|
| Christopher Pagliarella | Gordon D. Todd |
| YALE LAW SCHOOL | Robin Wright Cleary |
| FREE EXERCISE CLINIC | Daniel J. Hay |
| 1200 New Hampshire | SIDLEY AUSTIN LLP |
| Avenue, N.W., Suite 700 | 1501 K Street, N.W. |
| Washington, D.C. 20036 | Washington, D.C. 20005 |
| Tel: 202-830-1434 | Tel: (202) 736-8000 |
| christopher.pagliarella@yale.edu | gtodd@sidley.com |
| | rcleary@sidley.com |
| | dhay@sidley.com |

*Counsel for* Amici Curiae *Jewish Coalition for Religious Liberty and Chabad Lubavitch of Northwest Connecticut*

## CERTIFICATE OF COMPLIANCE

This Brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 29(a)(5) and Circuit Rule 32-1(a) because it contains 4,570 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This Brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface using the Microsoft Word 2016 word processing system in 14-point Century Schoolbook font.

 /s/ Gordon D. Todd
Gordon D. Todd
*Counsel to Amici Curiae*